IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

MAR 1 1 2008

U.S. D─────
──ANDRI─, V─.G─.

A.V., et al.,                    )
                                 )
              Plaintiffs,        )
                                 )
v.                               )      Civil Action No. 07-0293
                                 )
IPARADIGMS, LIMITED LIABILITY    )
COMPANY,                         )
                                 )
              Defendant.         )
                                 )

## MEMORANDUM OPINION

This matter comes before the Court on Plaintiffs' Motion for
Summary Judgment and Defendant's Motion for Summary Judgment.
Plaintiffs, four minor high school students, have filed a
complaint against Defendant iParadigms, LLC alleging copyright
infringement based on iParadigms' digital archiving of
Plaintiffs' copyrighted materials.  iParadigms has filed a
counterclaim seeking indemnification against all Plaintiffs.
iParadigms' counterclaim also alleges, as against Plaintiff A.V.,
(1) trespass to chattels, (2) violation of the Computer Fraud and
Abuse Act, 18 U.S.C. §§ 1030(a)(5)(A)(iii) and 1030(a)(5)(B)(I)
and (3) violation of the Virginia Computer Crimes Act, Va. Code.
§§ 18.2-152.3 and 18.2-152.6.

Defendant iParadigms owns and operates Turnitin, a
proprietary technology system that evaluates the originality of

written works in order to prevent plagiarism.  Educational institutions contract with iParadigms and require their students to submit their written works via Turnitin.  When the student work is submitted to Turnitin, the system compares the work electronically to content available on the internet, student works previously submitted to Turnitin and commercial databases of journal articles and periodicals.  Turnitin then produces an Originality Report for each submitted work, which indicates whether a student's paper is not original.  The teacher then evaluates the Originality Report and decides whether to address any issues with the student.  Upon request to Turnitin, the teacher can obtain, for comparison purposes, copies of archived works which appear to be plagiarized by the student.

Turnitin also has the ability to archive a student's work upon its submission to Turnitin.  This allows Turnitin's database to grow with each student work submitted.  However, this feature must be specifically authorized by the school district in order to allow Turnitin to archive the student-submitted works.  Over 7,000 educational institutions worldwide use Turnitin, resulting in the daily submission of over 100,000 works to Turnitin.

In order to submit a paper to Turnitin, a student must first register by creating a profile on the Turnitin web site.  The final step in the profile creation process requires that the student click "I Agree" to the terms of the "user agreement"

2

(also referred to as the "Clickwrap Agreement") which is displayed directly above the "I agree" link that the student must click.  The Clickwrap Agreement states: "Turnitin and its services are maintained by iParadigms, LLC ["Licensor"], and are offered to you, the user ["User"], <u>conditioned on your acceptance without modification</u> of the terms, conditions, and notices contained herein." (emphasis added).  The Clickwrap Agreement also contains a limitation of liability clause:

> In no event shall iParadigms, LLC and/or its suppliers be liable for any direct, indirect, punitive, incidental, special, or consequential damages <u>arising out of or in any way connected with the use of this web site</u> or with the delay or inability to use this web site, or for any information, software, products, and services obtained through this web site, or <u>otherwise arising out of the use of this web site</u>, whether based in contract, tort, strict liability or otherwise, even if iParadigms, inc. or any of its suppliers has been advised of the possibility of damages.

(emphasis added).

At the time of the filing of the complaint, Plaintiffs attended high school in Virginia, in the Fairfax County Public Schools ("FCPS") system, and in Arizona, in the Tucson Unified School District ("TUSD").  Both school systems contracted with iParadigms to utilize iParadigms' Turnitin technology system and both authorized Turnitin to archive student-submitted work. According to school administrators, plagiarism had become a major problem in each school district and Turnitin was employed in an effort to decrease plagiarism in their schools.  Both school

3

districts required their students to use Turnitin to submit their written works.  If a student chose not to submit his or her work via Turnitin, that student would receive a zero on the assignment.

Each of the Plaintiffs read and clicked "I agree" to the terms of the Clickwrap Agreement and each used Turnitin to submit their written works.  However, in an attempt to prevent Turnitin from archiving their written works, Plaintiffs included a disclaimer on the face of their works indicating that they did not consent to the archiving of their works by Turnitin. iParadigms continued to archive all student-submitted works, including all the works submitted by Plaintiffs.  Plaintiffs claim iParadigms' continued archiving of their works constitutes copyright infringement.

iParadigms' first counterclaim seeks indemnification from all Plaintiffs based on an indemnification clause contained in Turnitin's Usage Policy.  The Usage Policy is a separate and distinct document from Turnitin's Clickwrap Agreement.  In order to view the Usage Policy, the user must click on the "Usage Policy" link, which appears on each page of Turnitin's web site, including the login screen.  Once the link is clicked, the user can view the entire Usage Policy, which includes the following provision:

Indemnification: You agree to indemnify and defend
iParadigms from any claim (including attorneys fees and

4

costs) arising from your (a) use of the Site, (b) violation of any third party right, or (c) breach of any of these Terms and Conditions.

iParadigms contends that Plaintiffs were aware of and assented to the Usage Policy by their continual use of Turnitin, and should indemnify Plaintiffs for the cost of defending itself against Plaintiffs' underlying claims, which iParadigms alleges constitute "claim[s] . . . arising from [Plaintiffs'] use of the Site."

iParadigms' remaining counterclaims are based on Plaintiff A.V.'s alleged misuse of the Turnitin system. A.V. did not use Turnitin to submit his written work to McLean High School, where he was a student. Rather, he used Turnitin to submit his written work to the University of California, San Diego ("UCSD"), an educational institution in which A.V. was not enrolled. A.V. gained access to UCSD's Turnitin system by using a login ID and password for the UCSD system that A.V. or A.V.'s next friend found on the internet. A.V. acknowledged that he misrepresented himself as a UCSD student in order to submit his written work to UCSD. The User Guidelines established by FCPS require that students enrolled in the FCPS system, such as A.V., use Turnitin "only for FCPS classes and only in accordance with the terms and conditions on the Turnitin.com website." iParadigms alleges that A.V.'s misuse of the Turnitin system constitutes trespass to chattels, violation of the Computer Fraud and Abuse Act, 18

5

U.S.C. §§ 1030(a)(5)(A)(iii) and 1030(a)(5)(B)(I), and violation of the Virginia Computer Crimes Act, Va. Code. §§ 18.2-152.3 and 18.2-152.6.

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). A material fact in dispute appears when its existence or non-existence could lead a jury to different outcomes. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue exists when there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party. See id. Mere speculation by the non-moving party "cannot create a genuine issue of material fact." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985); see also Ash v. United Parcel Serv., Inc., 800 F.2d 409, 411-12 (4th Cir. 1986). Summary judgment is appropriate when, after discovery, a party has failed to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

6

Defendant iParadigms first contends that Turnitin's Clickwrap Agreement constitutes a valid contract entered into between Plaintiffs and iParadigms and that the limitation of liability clause precludes any liability in this action.   In Virginia, the essential elements of a contract are offer, acceptance and consideration.   See <u>Montagna v. Holiday Inns, Inc.</u>, 221 Va. 336, 346 (1980).   As one court has stated, "[a] contract is no less a contract simply because it is entered into via a computer."   <u>Forrest v. Verizon Communications, Inc.</u>, 805 A.2d 1007, 1010 (D.C. 2002).   In fact, many courts have found clickwrap agreements to be enforceable.   See <u>id.</u> at 1010-11 (clickwrap agreement enforceable and adequate notice provided of agreement terms where users had to click "Accept" to agree to the terms in order to subscribe); <u>DeJohn v. The .TV Corp. Int'l.</u>, 245 F. Supp. 2d 913, 921 (N.D. Ill. 2003) (clickwrap agreement valid and enforceable contract and "[t]he fact that the contract is electronic does not affect this conclusion"); <u>Koresko v. RealNetworks, Inc.</u>, 291 F. Supp. 2d 1157, 1162-63 (E.D. Cal. 2003) (clicking box on the screen marked, "I agree" on web site evinced express agreement to terms); <u>i.Lan Systems, Inc. v. Netscout Serv. Level Corp.</u>, 183 F. Supp. 2d 328, 338 (D. Mass. 2002) (clicking "I agree" box is an appropriate way to form enforceable contract); <u>Stomp, Inc. v. NeatO, LLC</u>, 61 F. Supp. 2d 1074, 1081 (C.D. Cal. 1999) (enforcing assent to terms by

7

clicking "accept" button).  Additionally, "waivers and limitation of liability clauses are enforceable" in Virginia.  Regency Photo & Video, Inc. v. America Online, Inc., 214 F. Supp. 2d 568, 573 (E.D. Va. 2002) (citing Blue Cross of Southwest Virginia and Blue Shield of Southwest Virginia v. McDevitt & Street Co., 234 Va. 191 (1987)).

The Court finds that the parties entered into a valid contractual agreement when Plaintiffs clicked "I Agree" to acknowledge their acceptance of the terms of the Clickwrap Agreement.  The first line of the Clickwrap Agreement, which appears directly above the "I Agree" link, states: "Turnitin and its services . . . are offered to you, the user ["User"], conditioned on your acceptance without modification of the terms, conditions, and notices contained herein." (emphasis added). Also, the Clickwrap Agreement provides that iParadigms will not be liable for any damages "arising out of the use of this web site."  By clicking "I Agree" to create a Turnitin profile and enter the Turnitin web site, Plaintiffs accepted iParadigms' offer and a contract was formed based on the terms of the Clickwrap Agreement.  Because a limitation of liability clause was among the terms of the Agreement, the Court finds that iParadigms cannot be held liable for any damages arising out of Plaintiffs' use of the Turnitin web site, which includes the submission and archiving of their written works.

8

The existence of disclaimers on the written works indicating that Plaintiffs did not consent to the archiving of their works does not modify the Agreement or render it unenforceable. The Clickwrap Agreement itself provides that the terms of the Agreement are not modifiable. Plaintiffs had the option to "Agree" or "Disagree;" no third option was available to allow Plaintiffs to modify the Agreement. See Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 403 (2d Cir. 2004) ("[The] choice was either to accept the offer of contract, taking the information subject to the terms of the offer, or, if the terms were not acceptable, to decline to take the benefits"). By clicking "I Agree," Plaintiffs agreed to the terms of the contract as described in the Clickwrap Agreement. Any attempted disclaimers written onto papers submitted after clicking "I Agree" did not change the terms of the Agreement.

Plaintiffs assert the defense of infancy in an attempt to void the terms of the Clickwrap Agreement. In Virginia, a contract with an infant is voidable by the infant upon attaining the age of majority. See Zelnick v. Adams, 263 Va. 601, 608 (2002) (citing Mustard v. Wohlford's Heirs, 56 Va. (15 Gratt.) 329, 337 (1859)). However, the infancy defense cannot function as "a sword to be used to the injury of others, although the law intends it simply as a shield to protect the infant from injustice and wrong." MacGreal v. Taylor, 167 U.S. 688, 701

9

(1897).  In other words, "[i]f an infant enters into any contract subject to conditions or stipulations, he cannot take the benefit of the contract without the burden of the conditions or stipulations."  5 Williston on Contracts § 9:14 (4th ed. 2007).

Plaintiffs received benefits from entering into the Agreement with iParadigms.  They received a grade from their teachers, allowing them the opportunity to maintain good standing in the classes in which they were enrolled.  Additionally, Plaintiffs gained the benefit of standing to bring the present suit.  Plaintiffs cannot use the infancy defense to void their contractual obligations while retaining the benefits of the contract.  Thus, Plaintiffs' infancy defense fails.

Plaintiffs also seek to invalidate the contract on the grounds of duress.  In Virginia, duress is defined as the "overbearing of a person's free will by an unlawful or wrongful act or by threat such that the party's consent to a contractual agreement is involuntary."  Freedlander v. NCNB Nat. Bank of North Carolina, 921 F.2d 272 (4th Cir. 1990) (unpublished table opinion) (citing Bond v. Crawford, 193 Va. 437, 444 (1952)).

Though Plaintiffs plead duress, there is no evidence that anyone was coerced in any fashion by Turnitin or iParadigms.  Insofar as Plaintiffs' duress defense is asserted against Plaintiffs' respective schools, rather than Defendant iParadigms, there is no support for the proposition that a contract can be

10

invalidated on the basis of third party duress.  <u>See</u> <u>Nelson v.</u>
<u>Nelson</u>, No. 0603-05-2, 2005 WL 1943248 at *2 (Va. Ct. App. Aug.
16, 2005) ("[Appellant] provides no support in Virginia law for
the invalidation of a contract based on a claim of 'duress or
undue influence of a third party,' and we know of none").
Nevertheless, even if there was evidence of coercion by
iParadigms, or even if a claim of third party duress by the
school systems was viable, such coercion would not rise to the
level of "an unlawful or wrongful act."  Schools have a right to
decide how to monitor and address plagiarism in their schools and
may employ companies like iParadigms to help do so.  As the
Supreme Court has recognized in the constitutional context, "the
rights of students in public school are not automatically
coextensive with the rights of adults in other settings" and the
"rights of students must be applied in light of the special
characteristics of the school environment."  <u>Morse v. Frederick</u>,
127 S.Ct. 2618, 2622 (2007) (internal quotations omitted).  If
Plaintiffs' objection is that their schools' policies requiring
students to use Turnitin are wrongful, Plaintiffs' proper redress
is with the school systems.  <u>See</u> <u>id.</u> at 2635 (Thomas, J.,
concurring) ("If parents do not like the rules imposed by those
schools, they can seek redress in school boards or legislatures;
they can send their children to private schools or home school
them; or they can simply move").  Thus, Plaintiffs' duress

defense fails.

iParadigms claims that even if the Clickwrap Agreement does not preclude liability in this case, iParadigms' use of the written works is a fair use under 17 U.S.C. § 107 and, as such, does not constitute copyright infringement. Fair use is a statutory exception to copyright infringement. The unauthorized use or reproduction of copyrighted work "for purposes such as criticism, comment, news reporting, teaching (including multiple cases for classroom use), scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107. In determining whether a particular use is a fair use, the following four factors must be considered:

> (1) the purpose and character of the use, including whether such use is of commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

Id.

In assessing "the purpose and character of the use," the fact that the new work, produced by the defendant, is "transformative" or "adds something new, with a further purpose or different character" is strong evidence that the use is a fair use. See Harper & Row, Publishers, Inc. v. Nation Enters., 471

U.S. 539, 562 (1985).   In fact, "the more transformative the new work, the less will be the significance of the other factors, like commercialism, that may weigh against a finding of fair use."   Id. at 579.   In Perfect 10, Inc. v. Google, Inc., 487 F.3d 701 (9th Cir. 2007), the Ninth Circuit recently addressed the use of works in a computer database and found the defendant's use to be transformative.   Plaintiff Perfect 10 sued Google for infringement based on Google's display of thumbnail-sized images from Perfect 10's web site, which were displayed by Google in response to a user search.   The court held that Google's reproduction of the images was "highly transformative" because "[a]lthough an image may have been created originally to serve an entertainment . . . or informative function, a search engine transforms the image . . . [and] provides a social benefit by incorporating an original work into a new work, namely, an electronic reference tool."   Perfect 10, 487 F.3d at 721.

This Court finds the "purpose and character" of iParadigms' use of Plaintiffs' written works to be highly transformative. Plaintiffs originally created and produced their works for the purpose of education and creative expression.   iParadigms, through Turnitin, uses the papers for an entirely different purpose, namely, to prevent plagiarism and protect the students' written works from plagiarism.   iParadigms achieves this by archiving the students' works as digital code and makes no use of

13

any work's particular expressive or creative content beyond the limited use of comparison with other works. Though iParadigms makes a profit in providing this service to educational institutions, its use of the student works adds "a further purpose or different character" to the works, see Harper & Row, 471 U.S. at 562, and provides a substantial public benefit through the network of educational institutions using Turnitin. Thus, in this case, the first factor favors a finding of fair use.

The second factor to be considered is "the nature of the copyrighted work." 17 U.S.C. § 107. This factor "focuses attention on the extent to which a work falls at the core of creative expression," and, in particular, whether "the incentive for creativity has been diminished." Bond v. Blum, 317 F.3d 385, 395-96 (4th Cir. 2003). In this case, this factor is of lesser import because the allegedly infringing use makes no use of any creative aspect of the student works. Rather, iParadigms' use relates solely to the comparative value of the works. Nevertheless, iParadigms' use in no way diminishes the incentive for creativity on the part of students. On the contrary, iParadigms' use protects the creativity and originality of student works by detecting any efforts at plagiarism by other students. Thus, the second factor either favors neither party or favors a finding of fair use.

14

The third factor to be considered is "the amount and substantiality of the portion used." 17 U.S.C. § 107.  The Supreme Court and the Fourth Circuit have indicated that a new work's complete and entire use of the original work does not automatically preclude a finding of fair use.  See, e.g., Sony Corp. Of America v. Universal City Studios, Inc., 464 U.S. 417 (1984) (making copies of complete television shows for purposes of time-shifting is a permissible fair use); Bond, 317 F.3d at 396 (use of entire manuscript "was not for expressive content" and "[did] not undermine the protections granted by the Act"). For example, in Perfect 10, the fact that Google displayed the entire Perfect 10 image in its search engine results did not make the use impermissible because the use was also highly transformative.  See Perfect 10, 487 F.3d at 724.

In this case, it is clear that iParadigms uses the entirety of the original works.  In order to be successful in its plagiarism detection services, it must.  However, the use of the original works is limited in purpose and scope.  The student works are stored digitally and reviewed electronically by Turnitin for comparison purposes only.  The only circumstance in which a student work can be produced for viewing is when another student's submission triggers an Originality Report that indicates the possibility of plagiarism.  If this occurs, the teacher can request to view the document which produced the

15

plagiarism alert in order to compare the two works.  This use is, as discussed above, highly transformative and highly beneficial to the public through educational institutions using Turnitin. Thus, this factor either favors neither party or favors a finding of fair use.

The fourth factor to be considered is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107.  This factor "is undoubtedly the single most important element of fair use."  Harper & Row, 471 U.S. at 566. As the Fourth Circuit has stated, "[a] use that does not materially impair the marketability of the copyrighted work generally will be deemed fair."  Sundeman v. SeaJay Society, Inc., 142 F.3d 194, 206 (4th Cir. 1998).  This factor requires courts to consider both the extent of the market harm caused by the defendant and whether the conduct of the sort engaged in by the defendant "would result in a substantially adverse impact on the potential market for the original."  Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 590 (1994) (internal quotations omitted).  A "key element" in this analysis is "whether the allegedly infringing work is a market substitute for the copyrighted work."  Sundeman, 142 F.3d at 207.

Here, it is clear that iParadigms' use of Plaintiffs' works has caused no harm to the market value of those works. Plaintiffs have failed to present any evidence of harm.  In fact,

when asked in deposition whether iParadigms' use of their works
impinged on the marketability of their works or interfered with
their use of the works, each Plaintiff answered in the negative.
Furthermore, iParadigms' use of Plaintiffs' works will not have a
"substantially adverse impact on the potential market" for high
school papers.[1]  Clearly, iParadigms' use does not amount to a
"market substitute" for Plaintiffs' works.  iParadigms stores its
archived papers digitally and they are not publicly accessible or
disseminated in any way.  In fact, iParadigms' use of Plaintiffs'
works has a protective effect, preventing others from using
Plaintiffs' works as their own and protecting the future
marketability of Plaintiffs' works.

Plaintiffs point to a potential harm that could arise if a
future recipient of Plaintiffs' work, such as a literary magazine
or a college admissions counselor, checks the originality of the
work using Turnitin.  Plaintiffs argue that Turnitin would return
a plagiarism alert because of the presence of the original work

---

[1] In their pleadings, Plaintiffs argue that iParadigms' use
of their works will have an adverse impact on their ability to
sell their works to web sites, such as www.ibuytermpapers.com,
that purchase original high school papers and resell them to
other high school students.  However, in deposition testimony,
each Plaintiff asserted that he or she would not sell their
papers to such sites because they viewed it as "cheating."
Moreover, to accept Plaintiffs' argument would contravene the
public benefit underpinnings of the Copyright Act and would run
counter to the Copyright Act's purpose of encouraging creative,
original work.  Thus, Plaintiffs' adverse market impact argument
is unpersuasive.

17

archived in the Turnitin system.  According to Plaintiffs, this could falsely indicate to the recipient that Plaintiffs are plagiarists, thereby harming the marketability of their works or their chances of college admission.

This argument is unpersuasive.  First, this type of harm is entirely speculative as there is no evidence indicating that Plaintiffs, or anyone else, have been harmed in this manner. Second, this type of harm is highly unlikely based on the manner in which the Turnitin system operates.  After Turnitin compares the submitted work to its database of archived works, it produces an Originality Report which identifies the percentage of the work that is not original.  Importantly, if the Report indicates that the work is not original, the Report identifies the original archived work and the educational institution in which it was first turned in.  Anyone who is reasonably familiar with Turnitin's operation will be able to recognize that the identical match is not the result of plagiarism, but simply the result of Plaintiff's earlier submission.  Individuals familiar with Turnitin, such as those in the field of education, would be expecting the works submitted to have been previously submitted. Because Plaintiffs have presented no evidence of harm and the potential harm alleged is both speculative and highly unlikely, the fourth factor strongly favors a finding of fair use.

Considering all four factors, the Court finds that

18

iParadigms' use of Plaintiffs' written works constitutes fair use under 17 U.S.C. § 107.

Next, the Court considers Defendant iParadigms' four counterclaims. First, iParadigms claims a right to indemnification against all Plaintiffs based on the indemnification clause contained in Turnitin's Usage Policy. iParadigms' indemnification claim fails for two reasons. First, the Usage Policy was not incorporated into the Clickwrap Agreement which Plaintiffs assented to when they clicked "I Agree" on the Turnitin web site. The Clickwrap Agreement states:

> Turnitin and its services . . . are offered to you, the user ["User"], conditioned on your acceptance without modification of the terms, conditions, and notices contained herein. Your use of this web site constitutes your agreement to all such terms, conditions, and notices. . . . This agreement constitutes the entire agreement between the user and iParadigms' with respect to usage of this web site and it supersedes all prior communications and proposals, whether electronic, oral, or written, between the user and iParadigms' with respect to usage of this web site.

(emphasis added). This language makes clear that, by clicking "I Agree," Plaintiffs were agreeing only to the provisions contained within the Clickwrap Agreement. The Clickwrap Agreement contains no indemnification clause and makes no reference to the Usage Policy. Additionally, the inclusion of the phrase, "[t]his agreement constitutes the entire agreement . . . with respect to usage of this web site" precludes any argument that additional terms, not contained in the Clickwrap Agreement, can be binding

19

on Plaintiffs.

Second, the Usage Policy is not binding on Plaintiffs as an independent contract because Plaintiffs did not assent to the Usage Policy.  While contractual indemnification clauses are valid and enforceable in Virginia, <u>see</u> <u>Safeway, Inc. v. DPI Midatlantic, Inc.</u>, 270 Va. 285, 289 (2005), "mutuality of assent — the meeting of the minds of the parties" is nevertheless "an essential element of all contracts."  <u>Phillips v. Mazyck</u>, 273 Va. 630, 636 (2007) (internal quotations omitted).  In this case, there is no evidence that Plaintiffs assented to the terms of the Usage Policy.  There is no evidence that Plaintiffs viewed or read the Usage Policy and there is no evidence that Plaintiffs ever clicked on the link or were ever directed by the Turnitin system to view the Usage Policy.

There is no evidence to impute knowledge of the terms of the Usage Policy to Plaintiffs.  In some instances, courts have imputed knowledge to web site users of the terms of use of those sites based on the users' repeated use of the sites and exposure to their terms of use.  <u>See</u>, <u>e.g.</u>, <u>Register.com, Inc.</u>, 356 F.3d at 401; <u>Fru-Con Constr. Corp. v. County of Arlington</u>, No. 1:06cv1, 2006 WL 273583 (E.D. Va. Jan. 30, 2006).  In this case, however, such imputation is improper because there is no evidence indicating that Plaintiffs were exposed to the terms of the Usage Policy.  For instance, in <u>Register.com</u>, the court imputed

20

knowledge of and assent to the web site's terms of use because the user "was daily submitting numerous queries, each of which resulted in its receiving notice of the terms Register exacted." Register.com, 356 F.3d at 401. Similarly, in Fru-Con Constr. Corp., the party denying the existence of a contract had represented to the defendant that it had "reviewed and thoroughly underst[ood] the scope, terms and conditions set forth" in a separate, specifically referenced document. Fru-Con Constr. Corp., 2006 WL 273583 at *2. In this case, Plaintiffs did not have the same type of exposure to the terms of use as did the users in Register.com or Fru-Con Constr. Corp.. There is no evidence that the terms of the Usage Policy were presented to Plaintiffs beyond the existence of the Usage Policy link that appeared on each page. And, as discussed above, the terms of the Usage Policy were not incorporated into the Clickwrap Agreement to which Plaintiffs assented. For these reasons, iParadigms' counterclaim for indemnification fails.

iParadigms' second counterclaim alleges trespass to chattels against Plaintiff A.V., based on A.V.'s acts of submitting written works to UCSD, where he was not enrolled. Trespass to chattels occurs "when one party intentionally uses or intermeddles with personal property in rightful possession of another without authorization." America Online, Inc. v. LCGM, Inc., 46 F. Supp. 2d 444, 451-52 (E.D. Va. 1998). One who

commits a trespass to a chattel is liable "if the chattel is
impaired as to its condition, quality, or value." Id. (internal
quotations omitted).  In other words, one who has committed such
a trespass is liable only "for actual damages suffered by reason
of loss of [the chattel's] use." Vines v. Branch, 244 Va. 185,
190 (1992).

There is no evidence that Turnitin has been impaired as to
its condition, quality, or value, or that Defendant has suffered
actual damages due to a loss of Turnitin's use.  iParadigms'
second counterclaim asserts that "Turnitin has expended
substantial time and resources investigating and rectifying the
situation with the instructors at the educational institutions in
which A.V. and [A.V.'s next friend] improperly logged in as
students in order to submit papers."  However, iParadigms has
only presented evidence of consequential damages resulting from
the steps taken by iParadigms in response to A.V.'s submissions.
This evidence fails to establish any actual damage or impairment
to the Turnitin system as a result of A.V.'s allegedly
unauthorized submissions to UCSD.  Because there is no evidence
of damage, iParadigms' counterclaim for trespass to chattels
fails.

iParadigms' third counterclaim alleges violation of the
Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030(a)(5)(A)(iii) and
1030(a)(5)(B)(I), against Plaintiff A.V..  According to sections

22

1030(a)(5)(A)(iii) and 1030(a)(5)(B)(I), whoever "intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage" resulting in "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value" can be subject to civil liability.  However, "[d]amages for a violation involving only section (a)(5)(B)(I) are limited to economic damages."  18 U.S.C. § 1030(h).  As discussed above, iParadigms has failed to produce any evidence of actual or economic damages resulting from A.V.'s allegedly unauthorized submissions to UCSD.  Therefore, iParadigms' third counterclaim for violation of the Computer Fraud and Abuse Act fails.

iParadigms' fourth counterclaim alleges violation of the Virginia Computer Crimes Act, Va. Code §§ 18.2-152.3 and 18.2-152.6, against Plaintiff A.V..  Section 152.3 states that "[a]ny person who uses a computer or computer network, without authority and: (1) Obtains property or services by false pretenses . . . is guilty of the crime of computer fraud."  Va. Code. §§ 18.2-152.3. Additionally, section 152.6 states that "[a]ny person who willfully obtains computer services without authority is guilty of the crime of theft of computer services."  Id. at §§ 18.2-152.6.  The Virginia Computer Crimes Act also provides that "[a]ny person whose property or person is injured by reason of a violation of any provisions of this article . . . may sue

23

therefor and recover for any damages sustained and the costs of the suit." Id. at §§ 18.2-153.12. As discussed above, iParadigms has failed to produce any evidence of actual or economic damages resulting from A.V.'s allegedly unauthorized submissions to UCSD. Therefore, iParadigms' fourth counterclaim for violation of the Virginia Computer Crimes Act fails.

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment should be granted as to all counterclaims and denied as to the complaint. Furthermore, Defendant's Motion for Summary Judgment should be denied as to all counterclaims and granted as to the complaint. An appropriate order shall issue.

_____/s/_____
Claude M. Hilton
United States District Judge

Alexandria, Virginia
March _11_, 2008